UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| HENRY ORTIZ, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) Case No. 13-cv-8270 |
| | ) |
| WERNER ENTERPRISES, INC., | ) Judge John W. Darrah |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Henry Ortiz has alleged claims of discriminatory discharge and hostile work environment against Defendant Werner Enterprises, Inc. ("Werner"), in violation of the Civil Rights Act of 1866 (as amended by the Civil Rights Act of 1991), 42 U.S.C. § 1981, and the Illinois Human Rights Act ("IHRA"), 775 Ill. Comp. Stat. 5/1-101, *et seq*. Werner has moved for summary judgment.

## LOCAL RULE 56.1

Local Rule 56.1 "is designed, in part, to aid the district court, 'which does not have the advantage of the parties' familiarity with the record and often cannot afford to spend the time combing the record to locate the relevant information,' in determining whether trial is necessary." *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011) (internal citation omitted). Local Rule 56.1(a)(3) requires the party moving for summary judgment to provide "a statement of material facts as to which the moving party contends there is no genuine issue." Rule 56.1(b)(3) then requires the nonmoving party to admit or deny each factual statement proffered by the moving party and, in the case of any disagreement, to specifically reference the "affidavits, parts of the record, and other supporting materials relied upon." *See Schrott v. Bristol-Myers Squibb Co.*, 403 F.3d 940, 944 (7th Cir. 2005). Rule 56.1(b)(3)(C) further permits

the nonmovant to submit additional statements of material facts that "require the denial of summary judgment." It is a violation of Rule 56.1 for a party to misstate the cited record. *De v. City of Chicago*, 912 F. Supp. 2d 709, 712 (N.D. Ill. 2012).

A litigant's failure to dispute the facts set forth in its opponent's statement in the manner required by Local Rule 56.1 deems those facts admitted for purposes of summary judgment. *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003); *see also Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 527 (7th Cir. 2000) (the district court has discretion to require strict compliance with its local rules governing summary judgment). Accordingly, to the extent that a response to a statement of material fact provides only extraneous or argumentative information, this response will not constitute a proper denial of the fact, and the fact is admitted. *See Graziano v. Vill. of Oak Park*, 401 F. Supp. 2d 918, 937 (N.D. Ill. 2005). Similarly, to the extent that a statement of fact contains a legal conclusion or otherwise unsupported statement, including a fact that relies upon inadmissible hearsay, such a fact is disregarded. *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997).

On April 23, 2015, the Court denied Werner's Motion to Strike Ortiz's Rule 56.1 Responses but stated that it would consider the substance of Werner's arguments when ruling on Werner's Motion for Summary Judgment. Many of Ortiz's Rule 56.1 Responses fail to comply with Rule 56.1. For example, Werner's SOF ¶ 39 states that "Werner discovered that Ortiz removed his name or changed contractually agreed upon rates on 6 different loads in

June 2012 . . . ." In response, Ortiz simply states, "Disputed. Ortiz Decl. ¶¶ 17-18 (Ex. 3)." This response is insufficient. The cited paragraphs of Ortiz's declaration do not dispute that Werner discovered that Ortiz removed his name from loads or changed rates. Rather, the cited paragraphs rely on a conversation Ortiz allegedly had with his supervisor about his termination.

Ortiz cannot rely on inadmissible hearsay to dispute facts. Furthermore, "facts are to be set forth in Rule 56.1 statements, and it is not the role of the Court to parse the parties' exhibits to construct the facts." *Cartwright v. Cooney*, No. 10 C 1691, 2013 WL 2356033, at *1 (N.D. Ill. May 29, 2013). "It simply is not the court's job to sift through the record to find evidence to support a party's claim." *Howard v. Inland SBA Mgmt. Corp.*, 32 F. Supp. 3d 941, 948 (N.D. Ill. 2014) (citing *Davis v. Carter*, 452 F.3d 686, 692 (7th Cir. 2006)).

Accordingly, the Court has deemed admitted those facts to which Ortiz had improperly responded under Rule 56.1, including where Ortiz has relied upon inadmissible hearsay or has included additional, unrelated allegations.

## BACKGROUND

Unless otherwise noted, the following facts are undisputed. Werner is a Nebraska corporation engaged in the transportation industry, including freight brokerage. (Def.'s Statement of Facts ("SOF") ¶ 1.) Ortiz is Hispanic and was employed by Werner from November 28, 2005 to June 19, 2012, as a freight broker at Werner's facility in Naperville, Illinois. (SOF ¶ 2.) Ortiz was interviewed and hired by the Naperville branch manager, Kip Lass. Lass, who is not Hispanic, was Ortiz's supervisor during Ortiz's employment with Werner. (*Id.*)

As a freight broker, Ortiz was responsible to find carriers to haul loads of freight for Werner's customers. (*Id.* ¶ 7.) There were three other freight brokers in his branch. (*Id.* ¶ 3.) Ortiz communicated with carriers to reach agreement on the payment a carrier would receive to

haul a given load of freight. The agreed-upon rates were memorialized either through an e-mail or a faxed document to the carrier and internally in Werner's "SMART" system. (*Id.* ¶ 9.)[1]

If a broker is able to book freight with a carrier for a lower price than what the customer was paying Werner, there is a profit. If not, there is a loss. (*Id.* ¶ 10.) The trucking industry is driven by supply and demand, and during times of the year in various regions where the demand for trucks is high, it is difficult to book loads for a profit. Werner's freight brokers can receive commissions on a graduated schedule based on their monthly profit margin. (*Id.* ¶¶ 10-11.) Where a freight broker has a large number of losses in a given month, this lowers his profit margin and he may receive no commission or a diminished commission. If a broker removes his name from a load that has a loss, he effectively increases his profit margin because the loss is no longer attributed to him. (*Id.* ¶ 25.)

Prior to 2012, Werner's four freight brokers were not assigned to any specific region, and the brokers could find loads on which they could make the most profit. (*Id.* ¶ 12.) In January 2012, pursuant to a recommendation by Warren Schollaert, a vice president of the division, Lass instituted a region-based system, where brokers were assigned to a region and responsible for all loads in that system. (*Id.* ¶¶ 12-13.) Ortiz was not happy about this change and stated it would not work in a small branch of four brokers. (*Id.*; *see also* Pl's Resp. to SOF ¶ 13.) Ortiz was assigned to and responsible for brokering all loads in the West region. (SOF ¶ 14.) Prior to that time, Ortiz had satisfactorily performed as a freight broker, as reflected in his December 2010 and 2011 performance evaluations. (Pl's Statement of Additional Facts ("SAF")

---

[1] The SMART system is a computer software program used by freight brokers to identify loads that need to be hauled and to track loads that have been brokered throughout the freight-hauling process.

¶ 82.) Ortiz also testified that Lass called him various derogatory names relating to his Hispanic ethnicity. (*Id.* ¶ 34.)

In June 2012, to show a profit, Ortiz removed his name as broker from three loads that were brokered in his region and also changed the contractually agreed upon rates with carriers for three other loads. (SOF ¶¶ 5, 37-38.) Werner discovered this after a customer called the assistant manager at the Naperville branch, Michael Krikava, for information about a load in Ortiz's region. (SOF ¶¶ 3, 38.) When Krikava searched for it, he found Ortiz had removed his name from the load at issue. (*Id.* ¶ 38.) Eventually, it was discovered that Ortiz had removed his name or changed contractually agreed upon rates on six different loads, though increasing his commission. (*Id.* ¶ 39). Lass reviewed this information, and with Schollaert's recommendation, discharged Ortiz on June 19, 2012, for falsifying records. (*Id.*).

Ortiz admitted to changing the records but claimed that other brokers also removed their names from loads resulting in significant losses or had cut rates. (*Id.* ¶ 26.) During discovery, Werner produced information on all loads brokered out of Naperville from June 1, 2011 to December 31, 2012. Out of the 16,931 loads, brokers removed their names for non-legitimate business reasons six times. (*Id.* ¶ 31.) In four of those six instances, it was Ortiz who removed his name – three times in June 2012 and one time in March 2012. (*Id.* ¶ 32.) For one of the other instances, the load data showed that another broker, Brad Brigham, removed his name only once on a loss of $6.89 and that Werner was not aware of this change. (*Id.* ¶ 33.) It was acceptable practice, however, to put Lass's or Krikava's name on a load if the brokers had their permission to do so. (*Id.* ¶ 64.) Ortiz further testified that no one would remove a name from a load with a huge loss without being instructed to do so; he admitted that no one instructed him to remove his name from the June loads. (*Id.* ¶ 27.)

5

Werner's Employee Handbook and Code of Conduct prohibit falsifying company records. (*Id.* ¶¶ 46-47.) In July 2012, another freight broker, who was not Hispanic, was terminated for falsifying records when it was discovered that the broker cut the mileage due to a carrier, thus increasing her margin and bonus potential. (*Id.* ¶ 59.)

On August 21, 2012, Ortiz filed a Charge of Discrimination with the Illinois Department of Human Rights ("IDHR"). His Charge identified the date of discrimination as June 19, 2012, and stated that he was discharged for falsifying records. (*Id.* ¶ 61.) On November 18, 2013, this action was removed by Werner from the state court. On December 17, 2013, Ortiz filed an Amended Complaint, which asserted a violation of the IHRA (Count I) and a violation of § 1981 (Count II).

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying the evidence it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). If the moving party meets this burden, the nonmoving party cannot rest on conclusory pleadings but "must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial." *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 596 (7th Cir. 1995) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986)). A mere scintilla of evidence is not sufficient to oppose a motion for summary judgment nor is a metaphysical doubt as to the material facts. *Robin v. ESPO Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000) (citations omitted). Rather, the evidence must be such "that a reasonable jury

could return a verdict for the nonmoving party." *Pugh v. City of Attica, Ind.*, 259 F.3d 619, 625 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

In considering a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005) (citing *Anderson*, 477 U.S. at 255). The court does not make credibility determinations or weigh conflicting evidence. *Id.*

**ANALYSIS**

A plaintiff may prove discrimination under § 1981 through the direct or the indirect burden-shifting methods of proof. *Andrews v. CBOCS West, Inc.*, 743 F.3d 230, 234 (7th Cir. 2014) (internal citations omitted). Under the direct method, the plaintiff must show, either through direct or circumstantial evidence, that his employer's unlawful discrimination caused him to suffer an adverse job action. *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 938-39 (7th Cir. 2003).

Under the indirect method, known as the *McDonnell Douglas* test, a plaintiff may establish a *prima facie* case of discrimination through competent evidence that: (1) he belonged to a protected class; (2) he performed his job satisfactorily so as to meet his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) his employer treated similarly situated employees outside of the protected class more favorably. *Weber v. Univs. Research Ass'n*, 621 F.3d 589, 593 (7th Cir. 2010); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). If the plaintiff satisfies this burden, the employer then has the burden to articulate a legitimate, nondiscriminatory reason for its decision. *Weber*, 621 F.3d at

7

593. The plaintiff may then challenge that reason as a pretext for discrimination. *Id.*; *see also Coffman v. Indianapolis Fire Dep't*, 578 F.3d 559, 563 (7th Cir. 2009).

Regardless of whether a plaintiff proceeds under the direct or indirect method of proof, the Seventh Circuit has observed that the fundamental question at the summary judgment stage is "whether a reasonable jury could infer prohibited discrimination." *Perez v. Thorntons, Inc.*, 731 F.3d 699, 703 (7th Cir. 2013); *see also Coleman v. Donahoe*, 667 F.3d 835, 863 (7th Cir. 2012) (Wood, J., concurring) ("By now . . . the various tests that we insist lawyers use have lost their utility . . . . In order to defeat summary judgment, the plaintiff one way or the other must present evidence showing that she is in a class protected by the statute, that she suffered the requisite adverse action . . . , and that a rational jury could conclude that the employer took that adverse action on account of her protected class, not for any non-invidious reason.").

*Direct Method*

A plaintiff may establish discrimination through the direct method either with direct evidence or circumstantial evidence. Direct evidence is rare and "essentially requires an admission by the decision-maker" of discrimination. *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004) (internal citations and quotations omitted); *see also Van Antwerp v. City of Peoria*, 627 F.3d 295, 298 (7th Cir. 2010). (direct evidence is the "so-called 'smoking gun'").

Ortiz alleges that Lass called him derogatory names throughout his employment. For derogatory remarks to constitute direct evidence of discrimination, the remarks must be: (1) made by the decision-maker (2) close in time to the decision and (3) related to the adverse employment action. *Egonmwan v. Cook Cnty. Sheriff's Dep't*, 602 F.3d 845, 850 (7th Cir. 2010) (citing *Hemsworth*, 476 F.3d at 491); *see also Fuka v. Thomson Consumer Elecs.*, 82 F.3d 1397,

8

1403 (7th Cir. 1996) (in direct proof case, plaintiff must show that remarks were related to the employment decision at issue; "[i]f such proof is lacking, the remarks alone will not give rise to an inference of discrimination even when uttered by the ultimate decisionmaker"); *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 491 (7th Cir. 2007) ("[I]solated comments that are no more than 'stray remarks' in the workplace are insufficient to establish that a particular decision was motivated by discriminatory animus.").

Even assuming that Lass made the alleged comments, and he denies doing so, none of the alleged comments relates to or references Ortiz's termination. Consequently, Ortiz has not established direct evidence of discrimination.

To proceed under the direct method using circumstantial evidence, a plaintiff must put forth sufficient evidence that creates "a convincing mosaic of discrimination," which would permit a jury to infer intentional discrimination. *Adams*, 324 F.3d at 939 (internal citations and quotations omitted). Such a mosaic can be established through proof of "suspicious timing, ambiguous oral or written statements, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn." *Dass v. Chicago Bd. of Educ.*, 675 F.3d 1060, 1071 (7th Cir. 2012). The circumstantial evidence "must point directly to a discriminatory reason for the employer's action . . . and be directly related to the employment decision." *Id.* (internal citations and quotations omitted); *see also Teruggi v. CIT Grp./Capital Fin., Inc.*, 709 F.3d 654, 660 (7th Cir. 2013) (same).

Here, Ortiz's evidence does not point to intentional discrimination by Werner. The timing of his discharge raises no suspicion; he was terminated shortly after Werner discovered he falsified records. Likewise, there is no evidence of ambiguous statements or behavior that would

9

point directly to a discriminatory reason. Ortiz alleges that other brokers commonly removed their names to avoid a loss and that only he was punished. However, he has not presented evidence that would support his claim beyond his own beliefs. Likewise, he has not presented evidence to support his argument that Krikava was scheming to fire him by saddling him with large losses.

In contrast, the evidence produced by Werner shows that it was improper and not common to remove a broker's name to avoid a loss. (SOF ¶¶ 26, 28-32, 34-36.) Werner produced data showing that, out of thousands of loads, there were only six times that a broker removed his name, and four of those times involved Ortiz. (*Id.* ¶¶ 31-32.) Werner did not know of the other two instances until it conducted discovery in this case. (*Id.* ¶ 33.) Other brokers testified that it was not proper to remove a broker's name from a load. (*Id.* ¶ 28.) Only one broker, Brigham, testified that it was done, but he said it was only with permission. (*Id.*) Ortiz argues that it was acceptable to put a load in Lass's or Krikava's name. However, the testimony established that this practice was only done with Lass's or Krikava's permission and that it was not proper to remove a broker's name entirely. (*Id.* ¶ 64; Pl. Resp.'s to SOF ¶¶ 6, 26-28.) As Ortiz admitted, he did not have permission to remove his name. (SOF ¶ 27.)

Likewise, the evidence showed that it was not common practice to cut a carrier's rates for late delivery. (SOF ¶ 35.) Werner brokers and employees testified that Werner was not able to cut a carrier's agreed upon rate for lateness and that they did not do so. (*Id.* ¶ 35.) Although one broker, Brigham, testified that it was done, he could not identify any examples. (*Id.* ¶ 36.) This is insufficient to create a material issue of fact whether Ortiz falsified company records in violation of Werner's company policy.

10

Ortiz has not created a convincing mosaic of discrimination that points directly to Werner's decision to terminate his employment. Therefore, he cannot prevail under the direct method.

*Indirect Discrimination*

To proceed under the indirect method, a plaintiff must establish all four element of a *prima facie* case of national origin discrimination. *See Weber*, 621 F.3d at 593. It is undisputed that Ortiz has satisfied the first *McDonnell Douglas* element because he is of Hispanic origin and suffered an adverse employment action when he was fired. However, Ortiz's *prima facie* case fails because he has not presented sufficient evidence that he met Werner's legitimate expectations or that similarly situated employees, not in his protected class, were treated more favorably.

Meeting Employer's Legitimate Expectations

With respect to the second element, Ortiz must establish that he was meeting Werner's legitimate expectations. The fact that Ortiz had received positive reviews in the past is not sufficient to establish he was meeting Werner's expectations when he was fired. *See, e.g., Zayas v. Rockford Mem'l Hosp.*, 740 F.3d 1154, 1158 (7th Cir. 2014) ( "[t]he question is not whether [plaintiff] *ever* satisfied the [employer's] expectations, but whether she met the [employer's] expectations *at the time she was fired*." (emphasis in original)); *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002) ("general statements of co-workers, indicating that a plaintiff's job performance was satisfactory, are insufficient to create a material issue of fact as to whether a plaintiff was meeting her employer's legitimate employment expectations at the time she was terminated.").

11

As discussed above, Ortiz was fired after he falsified records to remove his name and cut carrier's rates so as to show a profit, in violation of Werner's company policy. Ortiz admitted to this conduct and has not presented evidence to contradict Werner's stated policy. *See, e.g., Naik v. Boehringer Ingelheim Pharm., Inc.*, No. 07 C 3500, 2009 WL 1607575, at *4 (N.D. Ill. June 9, 2009) *aff'd,* 627 F.3d 596 (7th Cir. 2010) (falsifying records in violation of company policy did not meet employer's legitimate expectations). Accordingly, Ortiz cannot establish that he was meeting Werner's legitimate expectations at the time he was fired.

### Similarly Situated Employees

To establish the fourth prong, Ortiz must show that the similarly situated employees, not in his protected class, were treated more favorably. A similarly situated employee "must be directly comparable to the plaintiff in all material respects." *Coleman*, 667 F.3d at 846 (internal quotations and citations omitted). As discussed more fully above, Ortiz has not shown that other employees were engaging in this kind of behavior. Furthermore, Werner has put forth evidence that a non-Hispanic worker was fired shortly after Ortiz for falsifying records. Therefore, Ortiz cannot meet this prong to establish a *prima facie* case of discrimination.

### Pretext

Furthermore, even if Ortiz could establish all four prongs of a *prima facie* case, he cannot show that Werner's legitimate, non-discriminatory reason for firing him was pretextual. "[A] party establishes pretext with evidence that the employer's stated reason or the employment decision 'was a lie – not just an error, oddity, or oversight.'" *Teruggi*, 709 F.3d at 661 (quoting *Van Antwerp*, 627 F.3d at 298). Ortiz has presented no evidence that Werner's stated reason – firing him for falsifying records – was a lie. Therefore, Ortiz's claim for discrimination fails as a

matter of law. Summary judgment is granted in favor of Werner with respect to Ortiz's claim for discriminatory discharge.

*Hostile Work Environment*

Ortiz has also alleged a claim for hostile work environment under the IHRA, based on alleged racial harassment. Werner argues that Ortiz failed to exhaust his administrative remedies with respect to his hostile work environment claim because he failed to mention this claim in his charge filed with the Illinois Department of Human Rights on August 21, 2012. (SOF ¶ 61.) Rather, his charge mentioned only his discharge on June 19, 2012, for falsification of records and makes no mention of Ortiz's allegations of harassment. (*Id.*).

Ortiz does not dispute that his charge did not mention the harassment allegations contained in his Complaint, and he does not respond to Werner's argument in his Response brief. A charge of discrimination can differ from a charge of harassment. *See, e.g.*, *Smith v. Rosebud Farmstand*, 909 F. Supp. 2d 1001, 1005 (N.D. Ill. 2012) ("Being sent home from work and suffering a reduction in hours are classic examples of race discrimination, which is a different claim from being harassed with racial epithets, slurs, and comments."); *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1111-1112 (7th Cir. 1992) (affirming dismissal of racial harassment claim where plaintiff included a specific race discrimination claim in her charge but failed to include any reference to racial harassment). Because Ortiz failed to exhaust his administrative remedies with respect to his claim under the IHRA for hostile work environment, he cannot present that claim for the first time in this lawsuit. *See Rush*, 966 F.2d at 1112. Therefore, summary judgment is granted in favor of Werner on Ortiz's hostile work environment claim.

## CONCLUSION

For the reasons stated above, Werner's Motion for Summary Judgment [36] is granted. The civil case is terminated.

Date:     June 25, 2015     	            /s/ John W. Darrah            
                                         JOHN W. DARRAH
                                         United States District Court Judge